# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**BARTON GELLMAN**,

        Plaintiff,

        v.

**DEPARTMENT OF HOMELAND SECURITY**, *et al.*,

        Defendants.

Case No. 16-cv-635 (CRC)

## MEMORANDUM OPINION

Journalist Barton Gellman filed Freedom of Information Act ("FOIA") requests with a host of federal intelligence agencies seeking every record in their files that mentions his name. When many of the agencies failed to respond within the required statutory timeframe, Gellman filed this suit. The agencies have now finished processing all of Gellman's requests. In total, they provided him some 4,500 pages of responsive documents (in full or partially redacted) but have withheld many others. Before the Court are the parties' cross-motions for summary judgment over the agencies' withholdings. For the reasons explained below, the Court will uphold most of the challenged withholdings, enter summary judgment for Gellman on a handful of his claims, and deny summary judgment to each side on several issues where an agency needs to provide more detailed descriptions of the withheld or redacted documents.

## I.  Background

Barton Gellman is a Pulitzer Prize-winning journalist who reports on foreign affairs, the military, and intelligence issues. In 2013 and 2014, Gellman reported for the *Washington Post* on classified documents that had been leaked to him by former National Security Agency ("NSA") contractor Edward Snowden. Pl.'s Cross-Mot. for Summ. J. ("Cross-MSJ"), Exh. 4

("Gellman Decl.") ¶ 6.  Gellman is in the process of publishing a book about Snowden, the NSA, and "the boundaries of secret intelligence gathering in a democracy."  Id. ¶ 11.  Throughout 2015, Gellman submitted FOIA and Privacy Act requests to nine separate components of federal agencies (collectively, "the Government") seeking all records that mention his name.  Id. ¶¶ 14–22; Compl. Exhs. A–I.[1]  After some agencies failed to respond within the statutory timeframe and others informed Gellman that they were withholding all responsive records, he filed this suit in April 2016.  Over the next two years, the Government adhered to the Court's order to process and produce responsive, non-exempt records on a monthly basis.  After the Government issued its final response, the parties determined that dispositive motions were necessary.  The Government moved for summary judgment ("Defs.' MSJ") supported by declarations from each agency, including two *ex parte* declarations for the Court to review *in camera*, explaining each withholding and redaction.  Gellman filed a cross-motion for summary judgment and also asked the Court to review certain documents *in camera*.[2]  The Court heard argument on the motions on February 26, 2020.

---

[1] The recipient agencies are: the Department of Homeland Security ("DHS")—including its components the Office of Legislative Affairs, the Office of Intelligence and Analysis ("I&A") and the Transportation Security Administration ("TSA"); the Department of Justice ("DOJ")— including its components the Federal Bureau of Investigation ("FBI"), the Criminal Division, the Office of Information Policy ("OIP"), and the National Security Division ("NSD"); and the Office of the Director of National Intelligence ("ODNI").  Some agencies sought a consultation from the National Security Agency ("NSA"), which requested certain withholdings on its behalf.

[2] As indicated in his briefing, Gellman does not challenge the sufficiency of the searches conducted by any of the agencies.  See Pl.'s Cross-MSJ 2.  Nor does he contest the responses by DHS (or its components) and DOJ's Criminal Division.  See Pl.'s Cross-MSJ 2.  Finally, Gellman does not dispute the FBI's withholdings based on the attorney-client privilege or FOIA Exemptions 3, 6, and 7(C), OIP's withholdings based on Exemptions 6 and 7(C), ODNI's withholdings relating to personal information under Exemptions 3 and 6, the NSA's withholdings under Exemption 6, and all withholdings under Privacy Act exemption (j)(2).  See Pl.'s Cross-MSJ 2–3, 7 n.2, 15 n.4.

## II. Legal Standard

Summary judgment is the typical and appropriate vehicle to resolve FOIA disputes.  See Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976).  At the same time, FOIA contains a set of exemptions to an agency's general obligation to provide government records to the public, see 5 U.S.C. § 552(b), which are meant "to balance the public's interest in governmental transparency against the 'legitimate governmental and private interests [that] could be harmed by release of certain types of information,'" United Techs. Corp. v. Dep't of Defense, 601 F.3d 557, 559 (D.C. Cir. 2010) (quoting Critical Mass Energy Project v. Nuclear Reg. Comm'n, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc)) (alteration in original).  Because FOIA "mandates a 'strong presumption in favor of disclosure,'" its "statutory exemptions, which are exclusive, are to be 'narrowly construed.'"  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991); Rose, 425 U.S. at 361).

The Government bears the burden to establish that its claimed FOIA exemptions apply to each document for which they are invoked.  ACLU v. Dep't of Defense, 628 F.3d 612, 619 (D.C. Cir. 2011).  It may satisfy this burden through agency declarations that "describe[] the justifications for its withholdings with specific detail, demonstrat[ing] that the information withheld logically falls within the claimed exemption."  Id.  But agency declarations will not support summary judgment if the plaintiff puts forth contrary evidence or demonstrates the agency's bad faith.  Id.

## III.  Analysis

The Government supports its motion for summary judgment with declarations from the various agencies that responded to Gellman's FOIA requests.  See supra n.1.  Gellman raises a plethora of objections to the Government's claimed exemptions, which the Court will address sequentially.  But first, the Court will turn to Gellman's challenge to how the Government defined the scope of certain records.

### A.  Non-Responsive Records

An agency need only disclose records that are responsive to a FOIA request.  But once an agency has deemed a record responsive, it must provide the requester with the entire record unless a statutory exemption applies; in other words, it may not redact non-responsive portions of otherwise responsive records.  Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review, 830 F.3d 667, 677 (D.C. Cir. 2016) ("AILA").  Gellman claims that OIP unlawfully redacted non-responsive portions of 193 otherwise responsive records.[3]  Pl.'s Cross-MSJ 41–42.  OIP responds that it only withheld non-responsive records—not portions of responsive records—and that it only redacted non-responsive records when they appeared on a single page alongside responsive records.  That is, according to the declaration submitted by OIP Senior Counsel, redactions labeled "non-responsive" only appear on pages containing (1) multiple emails on disparate topics, only some of which pertain to Gellman, (2) emails to or from Gellman himself, which (OIP claims) were expressly excluded from the scope of his FOIA

_____

[3] Gellman also challenged one non-responsive withholding by NSD, but NSD has since released the record in full.  See Defs.' Reply, Ex. 3 ("Tiernan Decl.") ¶ 6.  That challenge is now moot.

request,[4] and (3) compilations of press articles on disparate topics, where only some of the articles pertain to Gellman. See Defs.' Reply, Exh. 4 ("Supp. Brinkmann Decl.") ¶ 16. In other words, the agency maintains that it defined each email and not the entire chain (or each press report and not the compilation) as a distinct record and appropriately withheld the non-responsive emails (and news stories) from the records it produced to Gellman.

This squabble raises two questions: What is a record, and who decides? As with all other aspects of FOIA, the agency first decides, and it is then the court's job to determine if the agency's explanation for its decision is reasonable. See Shapiro v. CIA, 247 F. Supp. 3d 53, 74–75 (D.D.C. 2017) (Cooper, J.) ("The burden will first rest with the agency to justify its actions when singling out a responsive record from a greater compilation of documents."). The agency defines the scope of the record when it begins to process a particular request. See AILA, 830 F.3d at 678 (explaining that the agency "in effect define[s] a 'record' when [it] undertake[s] the process of identifying records that are responsive to a [FOIA] request"). And it cannot flip its position on the scope of a record mid-litigation. Id. at 678–79; see also Judge Rotenberng Educ. Ctr. v. FDA, 376 F. Supp. 3d 47, 60 (D.D.C. 2019) ("[T]he defendants' withholding of non-responsive information in this case suffers a more fundamental problem: midway through litigation the defendants reclassified collections of information that had been treated as one agency record as multiple agency records."). Once an agency defines the scope of what

---

[4] The parties dispute whether Gellman excluded emails to or from himself from the scope of his FOIA request. According to his counsel, Gellman "said he did not want them unless they were forwarded to someone else within the agency so that he could have a complete record." Hr'g Tr. 37:4–6. Because they fall within the plain language of the requests, the Court will grant summary judgment for the Plaintiff for all emails to or from Gellman himself that were forwarded to someone else within the agency. See, e.g., OIP Doc. ID 0.7.19790.5066 (Supp. Brinkmann Decl. Exh. A).

constitutes a record, it must abide by that definition and may not make "non-responsive" redactions within the record.  If the agency is consistent from the start, the court must then determine whether its definition of the record was reasonable under the circumstances.  See Shapiro, 247 F. Supp. 3d at 74–75; see also Judge Rotenberng Educ. Ctr., 376 F. Supp. 3d at 60 ("[I]f the defendants had committed to a consistent understanding of when information should be treated as a single agency record, or separated into multiple agency records, that understanding could have prompted focused judicial review."); Am. Oversight v. Dep't of Health and Human Srvs., 380 F. Supp. 3d 45, 51 & n.3 (D.D.C. 2019) (holding that the agency's definition of a record was unreasonable).

The D.C. Circuit has set some broad guideposts for determining whether an agency has reasonably defined the contours of a record:  First, it has directed agencies and courts to OIP's guidance on this question.  AILA, 830 F.3d at 678 (citing DOJ, OIP Guidance: Determining the Scope of a FOIA Request, FOIA Update, Vol. XVI, No. 3 (1995), https://www.justice.gov/oip/blog/foia-update-oip-guidance-determining-scope-foia-request). OIP's guidance instructs agencies to consider "the requester's intent, maintaining the integrity of the released documents, the scope of the request, the agency's own knowledge regarding storage and maintenance of documents, efficiency, cost, resource allocation, and maintaining the public's trust in transparency."  Shapiro, 247 F. Supp. 3d at 74–75 (summarizing the factors described in OIP's guidance).  Second, the Circuit has "set a minimum bar for what *cannot* reasonably be considered a discrete, non-responsive record," namely "a single (or perhaps a few) sentences within an otherwise responsive paragraph."  Id. at 75 (citing AILA, 830 F.3d at 679). These considerations in mind, the Court will assess Gellman's arguments that the Government has improperly withheld non-responsive information.

*1. Email Chains*

The parties contest whether OIP was reasonable in disclosing only individual emails within email chains rather than the full chains. The agency withheld all unique emails that it deemed non-responsive, including by redacting any non-responsive emails that appear on the same page as responsive ones. Gellman objects to that approach. He would have the Court hold that an agency may never break up email chains to define individual emails as records. Hr'g Tr. 34:18–20. But that is not the law. As discussed above, an agency may define individual emails within a chain as separate records, as long as that decision (1) does not deviate from its prior position in responding to a particular FOIA request and (2) is reasonable under the circumstances. OIP has satisfied both requirements.

First, there is no indication that OIP has changed its position on the scope of the records during the course of processing and litigating Gellman's requests; it has always maintained that each email in a chain is a distinct record, as evidenced by the fact that it listed each responsive email separately in its Vaughn index and did not list entire chains nor any non-responsive email. Cf. Judge Rotenberng Educ. Ctr., 376 F. Supp. 3d at 61 (noting that how the agency lists an email chain in its Vaughn index is indicative of how it originally defined the record). The fact that OIP produced multiple emails within a chain on a single page with a single BATES stamp does not affect this conclusion. During its search, OIP collected emails within a chain in continuous documents, with multiple emails often appearing on a single page. After it defined each email as a record, it processed for production only the responsive ones. That production included pages with both responsive email records and redacted non-responsive email records. Because agencies "in effect define a 'record' when they undertake the process of identifying records that are responsive to a request," AILA, 830 F.3d at 678, the agency is not locked into

7

defining the scope of a record according to the form in which the records are collected. Defining

the scope of a record occurs after the initial collection of potentially responsive records, not

before. True, how a record is stored by the agency can be a factor in determining whether the

agency's definition of a record is reasonable. See Shapiro, 247 F. Supp. 3d at 74–75

(summarizing OIP's guidance factors, including "the agency's own knowledge regarding storage

and maintenance of documents"). But the mere fact that there is a single document with a single

BATES stamp for multiple emails does not alone mean that the agency has defined the entire

page as a single record.

Second, defining each email as a record was reasonable in this case. The agency located

responsive emails related to Gellman's FOIA request within email chains, and included

additional emails, as necessary, to provide context. See Supp. Brinkmann Decl. ¶¶ 17–18; see,

e.g., OIP Doc. No. 0.7.19790.10932 (Supp. Townsend Decl. Exh. 3). Each email thus "became

the responsive record, which the [agency] then reviewed for statutory exemptions." Shapiro, 247

F. Supp. 3d at 75. Gellman contends that defining individual emails within a chain as distinct

records is unreasonable in general because email chains are "commonly understood [to] operate[]

as a single record." Pl.'s Reply 20–21 (quoting Am. Oversight, 380 F. Supp. 3d at 51). That is

indeed how email chains are most commonly understood. As Judge Jackson correctly observed

in American Oversight, "[t]he very nature of a 'reply'—as opposed to a 'new message'—

necessarily implies that the communication is responsive to the message that came before, and

therefore it incorporates what came before, and the two form a unified exchange." 380 F. Supp.

3d at 51. But, while it may usually be true that email replies reflect a natural progression of

conversation on a unified topic, it is not always true. There are some circumstances where a

single email chain contains discussion of unrelated topics that may reasonably be delineated into

individual records, especially in the light of a particular FOIA request. This also comports with common experience: for example, the lengthy family email discussion entitled "Uncle Bob" that quickly pivots to a debate over reality television when someone asks, "By the way, did anyone see *The Bachelor* last night?"

A page from an email chain offered by Gellman likewise illustrates the point. See OIP Doc. No. 0.7.19790.10932 (Supp. Townsend Decl. Exh. 3). The document included two disclosed emails and a large redaction labeled "Non-Responsive Records." The first disclosed email—from DOJ public affairs director Brian Fallon to National Security Council spokesperson Caitlin Hayden at 11:53 p.m. on December 9, 2013—is responsive to the FOIA request because it mentions Gellman's name: "Did you see gellman's tweet today?" The next email in the chain—from Hayden to Fallon at 7:01 a.m. on December 10, 2013—includes the line: "But, just looked up his tweet – helpful."[5] Both emails were disclosed because they mention Gellman. The rest of the emails in the chain were withheld as non-responsive, following OIP's choice to define each email as a separate record. The question before the Court, then, is whether that decision was reasonable. If not, the Government must turn over the rest of the chain to Gellman. See AILA, 830 F.3d at 677. The subject line of the chain suggests why this was a reasonable choice. It reads, "Foreign Policy: White House v. Holder; The fight over the government's top national security lawyer." There is no indication in the record that any of Gellman's tweets from around December 9, 2013 had anything to do with a supposed conflict between the White House and the Attorney General as reported by *Foreign Policy*. Extending a presumption of good faith to the Government, and in the absence of evidence to the contrary, it is reasonable to assume that

---

[5] This email contains redactions based on Exemption 5, but they are not relevant to this discussion.

Fallon's question about Gellman's tweet (and Hayden's response) was an unrelated side discussion within an email chain that primarily discussed the *Foreign Policy* article. Read in that light, it was reasonable for OIP to decide, while processing this FOIA request, that each individual email constituted a record.[6] Indeed, a contrary conclusion would burden the agency with having to process emails on topics wholly unrelated to the subject of the FOIA request— including ascertaining whether any exemptions apply—which would hinder its ability to timely process requests and produce non-exempt, responsive documents to waiting requesters.

Accordingly, the Court will enter summary judgment for the Government with respect to its decision to withhold individual, non-responsive emails.[7]

---

[6] As above, the mere fact that multiple records appear on a single page in the production is not dispositive of whether the agency's definition of a record is reasonable. How an agency stores records is certainly a factor to consider, and an agency may not unreasonably break up a record into discrete parts that it stores and typically uses as a single record. See Shapiro, 247 F. Supp. 3d at 74–75 (summarizing OIP's guidance factors, including "maintaining the integrity of the released documents" and "the agency's own knowledge regarding storage and maintenance of documents"). But modern technology permits an agency to pull full email chains as a continuous document, a chain up to a certain point, or each distinct email within the chain on individual pages. See Supp. Brinkmann Decl. ¶ 17. Gellman would have the rule be that how the agency collects the emails is determinative of the scope of a record under FOIA, but that places form before function and the cart before the horse. As explained above, an agency defines the scope a record *after* it collects them, not before.

[7] At the hearing, Gellman's counsel pointed the Court to one instance where the Government redacted as non-responsive the subject line of an otherwise responsive email sent by a commercial news clipping service. Hr'g Tr. 77:21–78:10; see OIP Doc. No. 0.7.19790.5515 (Supp. Townsend Decl. Exh. 3). The Government has since "determined that it would remove all 'Non-Responsive Record' redactions made to information contained within the subject lines of emails sent by commercial news clip services." Defs.' Notice, ECF 50 (Mar. 10, 2020). Thus, this particular dispute is now moot. However, to the extent the Government has made any other unexplained non-responsive redactions in records that are narrower than the email level, the Court will enter summary judgment for the Plaintiff.

## 2. *News Compilations*

DOJ officials receive daily compilations of abridged media reports on relevant topics. OIP produced some of these compilations to Gellman. The Government redacted some articles within the compilations as "non-responsive" and, consistent with Gellman's request, produced only those stories that mentioned his name—usually because he wrote them. Gellman challenges the agency's decision to define each article as a separate record and contends that the entire compilation must be deemed a single record because they were distributed within a single email. See, e.g. OIP Doc. 0.7.19790.5515 (Supp. Townsend Decl. Exh. 2).

Applying the principles laid out above, there is no indication that OIP has changed its position on this definition of a record after it made its initial determination in this case. And this definition appears reasonable in light of Gellman's particular FOIA request, namely for any record that bears his name. OIP Senior Counsel explained that "the individual compiling each set of news clips had a particular purpose for compiling discrete pieces of information—to ensure that individuals could have access to relevant information in the news all in one place rather than in discrete individual emails for each record." Supp. Brinkmann Decl. ¶ 22. But, the agency determined, "based on the content of each article alone, that each article is distinct from the next [and] constitute[es] a discrete package of information." Id. ¶ 20. For example, agency counsel explained,

> The title of the news article, which acts as a header due to its larger and bolded font, as well as the inclusion of the date of publication, the name of the reporters who wrote each article, and the name of the publication from which the article was sourced, acts as a physical break in information.

Id. Because Gellman only sought records that mention his name, because "[e]ach article written by Plaintiff was deemed responsive and processed," and because "[o]nly those articles not

written by Mr. Gellman, or pertaining to him in any way, were deemed non-responsive," id. ¶ 21, the Government met its burden to show that this definition of a record was reasonable.

Therefore, the Court will enter summary judgment for the Government on the redactions of non-responsive records within news compilations.

B. Exemptions 1 and 3

FOIA Exemption 1 protects from disclosure information ordered by the Executive "to be kept secret in the interest of national defense or foreign policy" that is "in fact properly classified." 5 U.S.C. § 552(b)(1)(A). "An agency may invoke this exemption only if it complies with classification procedures established by the relevant executive order"—here Executive Order 13,526—"and withholds only such material as conforms to the order's substantive criteria for classification." King v. Dep't of Justice, 830 F.2d 210, 214 (D.C. Cir. 1987). Those criteria are: first, "an original classification authority must have classified the information;" second, "the information [must be] owned by, produced by or for, or is under the control of the United States Government;" third, "the information [must] fall[] within one or more of the categories of information listed in section 1.4 of the Executive Order;" and fourth, "the original classification authority [must] determine[] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the original classification authority is able to identify or describe the damage." Exec. Order 13,526 § 1.1(a), 75 Fed. Reg. 707 (Dec. 29, 2009). In evaluating whether these criteria are met, "[t]he Court must afford 'substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record,' and 'little proof or explanation is required beyond a plausible assertion that information is properly classified.'" Shapiro v. Dep't of Justice, 239 F. Supp. 3d 100, 121 (D.D.C. 2017) (quoting Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981); Morley v. CIA,

508 F.3d 1108, 1124 (D.C. Cir. 2007)) (emphasis in original). The agency's asserted justification need only "appear[] 'logical' or 'plausible.'" <u>Wolf v. CIA</u>, 473 F.3d 370, 375 (D.C. Cir. 2007) (quoting <u>Gardels v. CIA</u>, 689 F.2d 1100, 1105 (D.C. Cir. 1982)).

FOIA Exemption 3 protects information "specifically exempted from disclosure by statute," if that statute meets certain conditions. 5 U.S.C. § 552(b)(3). "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole inquiry for decision is the existence of a relevant statue and the inclusion of withheld material within that statute's coverage." <u>Goland v. CIA</u>, 607 F.2d 339, 350 (D.C. Cir. 1978). "[A]n agency invoking Exemption 3 must demonstrate its applicability 'in a nonconclusory and detailed fashion' and must provide 'the kind of detailed, scrupulous description [of the withheld documents] that enables a District Court judge to perform a searching *de novo* review.'" <u>Shapiro</u>, 239 F. Supp. 3d at 123 (quoting <u>Church of Scientology of Ca., Inc. v. Turner</u>, 662 F.2d 784, 786 (D.C. Cir. 1980)) (second alteration in original). Here, the Government primarily relies on the National Security Act, which qualifies as a withholding statute under Exemption 3. <u>Larson v. Dep't of State</u>, 565 F.3d 857, 865 (D.C. Cir. 2009). The National Security Act protects from unauthorized disclosure "intelligence sources and methods," 50 U.S.C. § 3024(i)(1), as well as "any information with respect to the activities" of the NSA, <u>id.</u> § 3605(a).

To support its withholdings under Exemptions 1 and 3, the Government has provided both an *ex parte* and a public declaration on behalf of ODNI and a public declaration on behalf of the NSA. Because each declaration raises different issues with respect to different documents, the Court will tackle each in turn.

1. *ODNI's* Ex Parte *Declaration*

Gellman complains that ODNI has submitted an *ex parte* declaration to justify withholding 129 records in full and 16 records in part and requests that the Court review the underlying documents themselves *in camera* to verify the explanations made in the non-public declaration.  Pl.'s Cross-MSJ 7–10; Pl.'s Mot. for *In Camera* Review 4–6.  Reviewing *ex parte* declarations *in camera* is appropriate when there "is a reasonable chance of harm to . . . national security . . . if any additional information is revealed on the public record."  Jarvik v. CIA, 741 F. Supp. 2d 106, 112 (D.D.C. 2010).  The Court has already reviewed the non-public declaration with an eye toward ensuring that "the public record is as complete as possible" and determined that ODNI did not need to publicly file a redacted version of the declaration.  See Minute Order (Apr. 8, 2019).  Upon carefully reviewing the declaration to consider the agency's justifications for these withholdings, the Court now finds that the *ex parte* declaration sufficiently satisfies the Government's burden under Exemption 1.  It will therefore enter summary judgment for Defendants on this issue and deny Plaintiff's motion for *in camera* review of the withheld documents.

Gellman also speculates that the 16 documents withheld in part by ODNI and justified by the *in camera* declaration were classified *after* he filed his FOIA request because they "are unambiguously marked 'UNCLASSIFIED.'"  Pl.'s Cross-MSJ 9 (quoting Nat'l Sec. Counselors v. CIA, 960 F. Supp. 2d 101, 167–68 (D.D.C. 2013) (agreeing with the plaintiff that production of documents denoted "unclassified" yet withheld under Exemption 1 "suggests that the information was not classified until after [the agency] received the[] FOIA requests")).  And he notes that Executive Order 13,526 provides a heightened standard for classifying documents after a FOIA request was submitted.  Pl.'s Cross-MSJ 8–9 (quoting Nat'l Sec. Counselors, 960 F.

Supp. 2d at 167).  Notwithstanding these facts, the Court has carefully reviewed the *ex parte* declaration and is satisfied that the agency has met its burden to show that it properly withheld classified information under Exemption 1.

### 2. *ODNI's Public Declaration*

ODNI withheld an additional 459 responsive documents in full under Exemptions 1 and 3, twenty-four of which were requested to be withheld by the NSA.[8]  It also withheld 41 documents in part, thirty-four of which were at the NSA's behest.  ODNI has sorted the 435 documents it withheld in full pursuant to Exemptions 1 and 3 into eight categories:

A. Analysis of damage that may be caused by information that has been reported in the media or is anticipated may be reported in the media (171 documents);

B. Requests for an analysis of damage that may be caused by information that is anticipated may be reported in the media (56 documents);

C. Annotated media reports or references to published or anticipated media reports that confirm whether or not particular reports contain classified information (22 documents);

D. Notifications from the [Intelligence Community ("IC")] regarding anticipated or actual unauthorized disclosures of sensitive national security information (41 documents);

E. Reports addressing intra-agency and inter-agency actions and deliberations in response to actual or anticipated unauthorized disclosures (16 documents);

F. Information that reveals the IC's method for responding to the possible disclosure of sensitive information in media reports, particularly discussions of how to respond to reporters (112 documents);

G. Analysis of sources and trends of unauthorized disclosures of sensitive national security information (14 documents); and

H. Details provided about intelligence sources and methods in response to questions by individuals following published news reports concerning IC activities (3 documents).

---

[8] The Court will discuss the NSA's requested withholdings in Part III.B.3.

Defs.' MSJ, Exh. E ("Graviria Decl.") ¶ 54.[9]  As Gellman concedes, an agency may describe

documents categorically "when the FOIA litigation process threatens to reveal the very

information the agency hopes to protect."  Pl.'s Cross-MSJ 14 (quoting Prison Legal News v.

Samuels, 787 F.3d 1142, 1149–50 (D.C. Cir. 2015)).  And it may "justify its withholdings and

redactions 'category-of-document by category-of-document, so long as its definitions of relevant

categories are sufficiently distinct to allow a court to determine whether specific claimed

exemptions are properly applied.'"  Prison Legal News, 787 F.3d at 1149–50 (quoting Citizens

for Responsibility & Ethics in Washington v. Dep't of Justice ("CREW"), 746 F.3d 1082, 1088

(D.C. Cir. 2014)).  "The range of circumstances included in the category must 'characteristically

support[] an inference that the statutory requirements for exemption are satisfied.'"  Id. at 1150

(quoting CREW, 746 at 1088-89) (alteration in original).

   The parties contest whether the level of detail provided in ODNI's declaration with

respect to the categories at issue is enough to justify the withholdings without *in camera* review

of the underlying documents.  The relevant inquiry is whether ODNI's descriptions of the eight

categories supply "an adequate foundation to review [] the soundness of the withholdings."

King, 830 F.2d at 218.  If the descriptions in the declaration are not sufficiently detailed, the

Court must review the underlying documents *in camera*.  As the D.C. Circuit explained:

> [R]equiring too much detail in a declaration could defeat the point of the exemption,
> but . . . in most cases the agency should not have difficulty describing the context
> and nature of the withheld information without revealing its substance.  Only in
> special circumstances, *such as those surrounding the intelligence mission of the
> National Security Agency*, can even minimal detail itself constitute sensitive
> information.

---

[9] ODNI withheld seven documents in full solely under Exemption 3 but did not note
which category those seven documents fell into.

<u>Campbell v. Dep't of Justice</u>, 164 F.3d 20, 31 (D.C. Cir. 1998) (citations omitted) (emphasis added). "In such circumstances," the Circuit went on to explain, "'the solution is for the court to review the document *in camera*' rather than passively accept an agency's unsubstantiated exemption 1 defense." <u>Id.</u> at 31 n.9 (quoting <u>Simon v. Dep't of Justice</u>, 980 F.2d 782, 784 (D.C. Cir. 1992)).

ODNI has for the most part met this specificity requirement. Unlike the vague descriptions of "routine FBI surveillance and monitoring techniques" at issue in <u>Campbell</u>, ODNI has provided enough information in the descriptions of seven of the categories for the Court to determine whether the records were properly withheld. <u>Id.</u>; <u>cf.</u> <u>Oglesby v. Dep't of Army</u>, 79 F.3d 1172, 1184 (D.C. Cir. 1996) (finding the NSA's descriptions inadequate where the agency's declaration "offered no details regarding the [withheld] documents, but conclusively stated they were all currently and properly classified").

ODNI justifies its Exemption 1 withholdings on the ground that the documents were properly classified pursuant to sections 1.4(c) and 1.4(d) of Executive Order 13,526, which cover information concerning "intelligence activities [and] intelligence sources or methods" or "foreign relations or foreign activities of the United States." Exec. Order 13,526, 75 Fed. Reg. at 708. ODNI justifies its Exemption 3 withholdings on the ground that the documents "contain 'intelligence sources and methods' or [their] disclosure would reveal otherwise protected information." <u>CIA v. Sims</u>, 471 U.S. 159, 168 (1985) (quoting 50 U.S.C. § 3024(i)(1)). According to ODNI's Director of the Information Management Division, the withheld-in-full documents "are all emails and attachments to emails which concern" either "the Government's method for responding to the disclosure or potential disclosure of sensitive intelligence information in media reports" or "intelligence information about sensitive intelligence sources

and methods that was included in, anticipated may be included in, or discussed as a result of media reports." Graviria Decl. ¶¶ 57–59. All the documents were properly withheld under both Exemption 1 and 3, the director attests, because disclosure would reveal "intelligence sources and methods."

The Court concludes that the declaration's descriptions of seven of the eight categories—all but category F—"support an inference" that the documents "logically and plausibly" include information about intelligence sources and methods. See Prison Legal News, 787 F.3d at 1150 (internal quotation marks and alterations omitted); Wolf, 473 F.3d at 376. Documents discussing anticipated or actual unauthorized disclosures of sensitive national security information in the press could confirm the existence or accuracy of this information, which in turn could expose intelligence methods and sources. See Whitaker v. CIA, 31 F. Supp. 3d 23, 37 (D.D.C. 2014), aff'd sub nom. Whitaker v. Dep't of State, No. 14-5275, 2016 WL 9582720 (D.C. Cir. Jan. 21, 2016) (permitting the CIA to protect documents that are not themselves intelligence sources or methods but that would logically contain such information); see also Graviria Decl. ¶¶ 68–69 (describing the dangers of alerting hostile groups to articles that may or may not contain national intelligence information). If these categories of documents include what ODNI's senior official attests they include—which the Court must accept absent contrary evidence—the Court need not review these documents *in camera* to conclude they were properly exempted from disclosure.[10]

---

[10] Gellman also challenges the Government's segregability analysis of the 459 records withheld in full by ODNI under Exemptions 1 and 3. Pl.'s Cross-MSJ 18–19. FOIA requires "[a]ny reasonably segregable portion of a record [to] be provided to any person requesting such record after deletion of the portions which are exempt . . . ." 5 U.S.C. § 552(b). Thus, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." Mead Data Cent., Inc. v. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977). Agencies must provide "the reasons behind their conclusions" that non-exempt material is not reasonably segregable. Id. at 261. "Nevertheless, '[a]gencies are entitled to a presumption

In contrast, the description of category F—information revealing "the IC's method for responding to the possible disclosure of sensitive information in media reports, particularly discussions of how to respond to reporters"—does not alone support an inference that the documents logically and plausibly include information that would reveal intelligence sources and methods. In support of withholding of documents in category F, ODNI relies solely on a statement in its declaration that avers, without any further detail, that methods for responding to the media "concern an intelligence method." Defs.' Reply 10–11 (quoting Graviria Decl. ¶ 58). But that justification merely restates the standard; it does not explain how revealing a method for responding to the media would in fact concern or reveal intelligence methods. See Hayden v. Nat'l Sec. Agency/Cent. Sec. Agency, 608 F.2d 1381, 1387 (D.C. Cir. 1979) ("The affidavits will not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping."). And the explanation is not readily apparent to the Court. The Supreme Court has defined an intelligence source as one that "provides, or is engaged to provide,

---

that they complied with the obligation to disclose reasonably segregable material,' which must be overcome by some 'quantum of evidence' by the requester." Henderson v. ODNI, 151 F. Supp. 3d 170, 179 (D.D.C. 2016) (quoting Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1117 (D.C. Cir. 2007)). And, "[o]f course agencies should not be forced to provide such a detailed justification that would itself compromise the secret nature of potentially exempt information." Mead Data Cent., 566 F.2d at 261. Further, "the classified nature of a document, in some circumstances, is at least a consideration." Int'l Counsel Bureau v. Dep't of Defense, 906 F. Supp. 2d 1, 9 n.4 (D.D.C. 2012); see also Anderson v. CIA, 63 F. Supp. 2d 28, 30 (D.D.C. 1999) (considering the fact that the records were withheld pursuant to Exemption 1 in finding that segregability was unnecessary where the government attested that there was no segregable material that could be disclosed).

ODNI has explained that "[a]ll of the information that has been withheld has been reviewed for purposes of complying with FOIA's segregability provision" and that "[a] review of each of the responsive documents identified by ODNI was performed and all reasonably segregable, non-exempt information has been released." Graviria Decl. ¶ 77. Given that ODNI has released some documents in part, and based on the descriptions of the documents withheld in full under Exemption 1, the Court is satisfied that ODNI satisfied its segregability obligations.

information the Agency needs to fulfill its statutory obligations." Sims, 471 U.S. at 177. An intelligence method, then, is "a procedure for attaining" that information. *Method*, Oxford English Dictionary, www.oed.com/view/Entry/117560; see also ACLU v. CIA, 892 F. Supp. 2d 234, 243 (D.D.C. 2012) (holding that information may be withheld "as long as [it] pertains to methods of [intelligence] *collection* that the agency used to perform its 'statutory duties with respect to foreign intelligence'" (quoting Sims, 471 U.S. at 169–70) (emphasis added)). It is neither logical nor plausible that a method for responding to the press is a "procedure for attaining" intelligence information.

That only gets Gellman so far, however. It may be that the agency staff discussed actual intelligence sources and methods in the course of considering how to respond to a specific potential disclosure of sensitive information, but the description of category F is capacious enough to include discussions of general media-response policies. Such policies alone may not be withheld. The Government, therefore, must either produce the documents or provide the Court with more information about the documents in category F to enable it to decide whether they were properly withheld. The Court will deny summary judgment for both parties over those documents.

As for the seven documents ODNI withheld in part, Gellman again challenges whether the descriptions of the documents are specific enough to permit adequate judicial review. In Documents 37 and 40, ODNI states that it "redacted a Government employee's reference to a particular intelligence method." Graviria Decl. ¶ 45. And in Documents 44 through 48, it redacted "a discussion reflecting the Government's method for responding to media reports regarding sensitive national security information." Id. ¶ 45. While ODNI's descriptions here are not overly detailed, they are more specific than those in Shapiro v. Department of Justice, where the Government lumped a swath of documents together and simply said that they include "a

myriad of available methods of intelligence gathering." 239 F. Supp. 3d 100, 123 (D.D.C. 2017) (finding that "the declarations [the FBI] has provided to date are simply too broad and conclusory to allow the Court to perform the type of 'searching de novo review' required by the governing precedent"). In contrast, ODNI—for Documents 37 and 40—looked at the specific documents and averred that they refer to particular intelligence methods. That pin-pointing assures the Court that ODNI has done its job, and so the Court will uphold the redactions. The descriptions of the withholdings in Documents 44–48, however, suffer from the same problem as that concerning withheld-in-full documents in category F in that they could encompass discussions about a general method for responding to the media.

Accordingly, the Court will deny Gellman's motion for *in camera* review of a representative sample of the documents themselves and enter summary judgment for the Government as to the documents contained in categories A–E, G, and H, and as to the partial withholdings in Documents 37 and 40. As for category F and Documents 44–48, the Court will deny summary judgment for both parties and order ODNI to either (a) disclose any otherwise non-exempt information to the Plaintiff, or (b) along with any renewed motion for summary judgment, file a more sufficient declaration and Vaughn index which explains in greater detail why ODNI believes the 112 documents withheld-in-full and the five documents withheld-in-part contain information about intelligence sources and methods.

### 3. The NSA's Public Declaration

Gellman also challenges the NSA's request that ODNI withhold twenty-four documents in full under Exemptions 1 and 3, and thirty-four documents in part under Exemption 3 only. He contends that the agency failed to provide "even a general description"—either individually or categorically—or "an explanation as to which exemption" applies to which document. Pl.'s

Cross-MSJ 16. Indeed, the NSA fails to provide much description of the documents at all, categorically or otherwise. Its declaration merely states that "*most* of the documents withheld in full by NSA are currently and properly classified," Defs.' MSJ, Exh. I ("Kiyosaki Decl.") ¶ 34 (emphasis added), and that disclosure would reveal information about its signals intelligence (or "SIGINT") activities, "which implicate both the Agency's core functions and activities, as well as intelligence sources and methods," id. ¶¶ 22, 38. These rather sparse descriptions do not pass muster under Exemption 1 because they "are simply too broad and conclusory to allow the Court to perform the type of 'searching de novo review' required by the governing precedent." Shapiro, 239 F. Supp. 3d at 123.

However, the documents are properly withheld under the broader language in Section 6 of the National Security Act, which protects from disclosure "any information with respect to the activities" of the NSA. 50 U.S.C. § 3605(a); see, e.g., Linder v. NSA, 94 F.3d 693, 969 (D.C. Cir. 1996) (quashing a subpoena seeking SIGINT reports). Gellman argues that internal agency emails, unlike the SIGINT reports themselves at issue in Linder, are not likely to contain information about the NSA's activities, and therefore the Court should not take the NSA at its word. Pl.'s Cross-MSJ 26. But Section 6 accommodates much more than SIGINT reports; it applies to "*any* information with respect to the activities" of the NSA. 50 U.S.C. § 3605(a) (emphasis added). And the NSA is "not required to provide any information as to the particular security threats posed by the release of the documents." Linder, 94 F.3d at 969; see also Wolf, 473 F.3d at 378 (holding that greater deference is afforded under the National Security Act). All the NSA is required to do is declare that the emails would reveal information about its activities.

The NSA has done so here, and the Court, applying the presumption of good faith, will enter summary judgment for the Government with respect to those records.[11]

C.  Exemption 4

Exemption 4 permits an agency to withhold "trade secrets and commercial or financial information obtained from a person [that are] privileged or confidential."  5 U.S.C. § 552(b)(4).  Here, OIP withheld (at ODNI's request) "copyrighted bulletins summarizing intelligence news reports which are prepared, pursuant to contract, by a non-governmental outside vendor for distribution to members of the ODNI workforce."  Graviria Decl. ¶ 84.  In particular, ODNI justifies withholding these copyrighted bulletins as "commercial information" on the ground that "the contract vendor has a commercial interest in the formatting, design, and organization of the bulletins" as well as in which articles are selected.  Graviria Decl. ¶ 85.  It explains that disclosure could "put the vendor's business model, as well as the relevant contract, at risk."  Graviria Decl. ¶ 85.

Gellman contends that the bulletins are not "commercial" under Exemption 4 because that word should be narrowly interpreted to cover only documents related to financial information.  Pl.'s Cross-MSJ 28 (citing as examples Kahn v. Fed. Motor Carrier Safety Admin., 648 F. Supp. 2d 31, 36 (D.D.C. 2009), which "easily conclude[d]" that documents containing "revenue, net worth, [and] income" information were commercial, and Racal–Milgo Gov't Sys., Inc. v. Small Bus. Admin., 559 F. Supp. 4, 6 (D.D.C. 1981), which noted that audits, technical proposals, profit margins, and customer names were all protected under Exemption 4).  But the

_____

[11] Though a closer call, in light of the broad nondisclosure requirements of Section 6, the Court also finds that the NSA has met its obligations to review the documents for segregable non-exempt information.  See Kiyosaki Decl. ¶ 42 ("Based upon my review, I have concluded that all the records the NSA withheld in full are exempt from disclosure . . . .").

cases he cites do not limit Exemption 4 to documents that are financial in character; they merely

explain that such documents easily fit within the category. And while "[n]ot every bit of

information submitted to the government by a commercial entity qualifies for protection under

Exemption 4," Pub. Citizen Health Research Grp. v. FDA, 704 F.2d 1280, 1290 (D.C. Cir.

1983), the information withheld here qualifies. ODNI presumably awarded the vendor its

contract, in some part at least, because of how it formats, designs, and organizes its product.

While not exactly the crown jewels, if competitors had access to that copyrighted information, it

could implicate the vendor's commercial interest in maintaining the contract.

Gellman also disputes whether the bulletins are "confidential." A commercial or

financial matter is considered confidential under Exemption 4 if it is "customarily kept private,

or at least closely held, by the person imparting it." Food Mktg. Inst. v. Argus Leader Media,

139 S. Ct. 2356, 2363 (2019). The bulletins here are prepared for ODNI under contract and there

is no suggestion in the record that they are readily available outside of the agency. They are thus

"closely held" by the vendor. See id. And even though there is no evidence in the record of an

express assurance by ODNI to the vendor that the information will remain confidential, the

absence of such an assurance in this case does not change the outcome.[12] Therefore, the Court

will enter summary judgment for the Government regarding its withholding of the "formatting,

design, and organization of the bulletins."

_____

[12] At the hearing, Gellman's counsel raised the possibility that the third party must have
assurances from the government that its commercial information would be held confidential
before it may be withheld under Exemption 4. Hr'g Tr. 12:21–13:22. The Supreme Court has
explicitly left open whether such assurances are mandatory. Food Mktg. Inst., 139 S. Ct. at
2363. The Court treats the absence of evidence in the record of an assurance of confidentiality as
one factor to consider in determining whether the information meets the definition of
"confidential" under FOIA.

Even so, Gellman argues that the formatting, design, and organization can simply be redacted so that the substance of the bulletins can be released. The Government failed to respond to this argument in its briefing. Indeed, there are other examples of news bulletins disclosed to Gellman where the Government has provided the text of the responsive clippings. Seeing no reason why the text of the individual articles themselves would be exempt, the Court therefore will enter summary judgment for Plaintiff as to the substance of the responsive articles contained in bulletins and order the Government to provide that information to Gellman in redacted form.[13]

D.  Exemption 5

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This exemption includes all privileges that would apply during discovery in ordinary litigation, including the deliberative process privilege and the attorney client privilege.  Gellman challenges the Government's assertion of Exemption 5 to withhold records under the deliberative process privilege, which protects government records that are both predecisional and deliberative.  See Tax Analysts v. IRS, 117 F.3d 607, 616 (D.C. Cir. 1997). To be exempt, the records must have been a part of a "definable decision-making process."  Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys., 762 F. Supp. 2d 123, 135–36 (D.D.C. 2011).  An agency must show (1) "what deliberative process is involved, and the role played by the documents at issue in the course of that process," Heggestad v. Dep't of

---

[13] The Court notes that it has held that the Government reasonably defined each article as an individual record within a larger bulletin.  See supra Part III.A.2.  Because Gellman only requests records that mention his name, the Government may provide only responsive articles, consistent with this opinion.

Justice, 182 F. Supp. 2d 1, 7 (D.D.C. 2000) (quoting Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 868 (D.C. Cir. 1980)), and (2) that the withheld record "makes recommendations or expresses opinions on legal or policy matters," Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C. Cir. 1975). By including the deliberative process privilege within Exemption 5, Congress sought "to encourage frank discussion of policy matters, prevent premature disclosure of proposed policies, and avoid public confusion that may result from disclosure of rationales that were not ultimately grounds for agency action." Petrucelli v. Dep't of Justice, 51 F. Supp. 3d 142, 161 (D.D.C. 2014). The Government has applied this privilege to three categories of documents: (1) internal emails discussing how to respond to the press; (2) internal emails reacting to news articles; and (3) a 2-page document relating to a particular FBI investigation.

### 1. Responses and Reactions to the Press

First, Gellman challenges the Government's assertion of the deliberative process privilege over emails related to responding to press inquiries and emails reflecting reactions to news reports. The parties at times conflate these two sorts of records into a single analysis, but they are distinct. As the Government correctly points out, documents containing discussions of how to respond to press inquiries are protected by the deliberative process privilege. See Am. Ctr. for Law & Justice v. Dep't of State, 330 F. Supp. 3d 293, 304 (D.D.C. 2018). That is because such discussions are predecisional (in that they come before the response is formulated and made) and deliberative (in that they concern what the response should be).[14] Gellman resists

---

[14] Gellman is of course correct that the exemption does not protect statements that were actually made to press, even if the statements are also reflected in email drafted prior to the response. See Coastal States Gas Corp., 617 F.2d at 866 ("[E]ven if [a] document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or

this conclusion on two grounds:  First, he contends that internal dialogue about how to respond to the press categorically is not protected by the deliberative process privilege because those exchanges "do not 'discuss the wisdom or merits of a particular agency policy.'"  Pl.'s Cross-MSJ 33 (quoting Petroleum Info. Corp. v. Dep't of Interior, 976 F.2d 1429, 1435 (D.C. Cir. 1992)).  Yet, "the overwhelming consensus" among courts in this District is that discussions about how to respond to the press are protected by this privilege.  Am. Ctr. for Law & Justice v. Dep't of Justice, 325 F. Supp. 3d 162, 171–72 (D.D.C. 2018) ("While the D.C. Circuit does not appear to have addressed the application of [the deliberative process] privilege to public-relations issues, the overwhelming consensus among judges in this District is that the privilege protects agency deliberations about public statements."); see also Leopold v. ODNI, No. 16-2517, 2020 WL 805380, at *6 (D.D.C. Feb. 18, 2020) (collecting cases).[15]  The Court agrees with that position.

_____

informally, as the agency position on an issue or is used by the agency in its dealings with the public.").  Thus, the Government must turn over any predecisional statements to the extent they match precisely the agency's actual statements to the press.

[15] Gellman's reliance on Pub. Emps. for Envtl. Responsibility v. EPA, 288 F. Supp. 3d 15 (D.D.C. 2017), is misplaced.  There, the agency claimed an email exchange among EPA staff discussing and commenting on several studies was predecisional because and the agency "had not yet responded to the questions posed by the reporter and was seeking information in order to respond to the question."  Id. at 25.  The court rejected that argument because "[e]ven the unredacted record d[id] not reveal anything about 'the reporter' who was 'seeking information' that EPA mentioned in its Vaughn Index."  Id.  The court did not afford any weight to the agency's unsupported assertion that the documents were in fact discussing how to respond to the press; it did not hold (as Gellman suggests) that preparing responses to reporters is not predecisional for purposes of the deliberative process privilege.  And the Court simply finds unpersuasive the cases Gellman cites from outside this District.  See, e.g., Sun-Sentinel Co. v. DHS, 431 F. Supp. 2d 1258 (S.D. Fla. 2006), aff'd sub nom. News-Press v. DHS, 489 F.3d 1173 (11th Cir. 2007).

Gellman attempts to distinguish the above-cited cases by pointing out that they did not involve the "implementation of established agency [press] policy." See Pl.'s Cross-MSJ 34–35; Pl.'s Reply 15. He contends that because DOJ has a press policy, any discussions related to responding to the press cannot be withheld under the deliberative process privilege. Pl.'s Cross-MSJ 34–35. But a general press policy does not strip an agency's ability to deliberate about how to respond to specific press inquiries without losing the protection of the deliberative process privilege. The cases Gellman musters do not support his broad conclusion. In Tax Analysts v. IRS, for example, the D.C. Circuit held that the deliberative process privilege did not apply to records that "simply explain and apply established agency policy." 294 F.3d 71, 81 (D.C. Cir. 2002) (quoting Coastal States Gas Corp., 617 F.2d at 869). Of course, formulating responses to specific press inquiries is not simply explaining and applying a general policy of how to do so; those discussions contain actual deliberation related to the agency's public positions. Many of the Government's Exemption 5 withholdings fit this mold and thus were properly withheld. In NSD Document 000031, for example, the Government redacted a section of an email after the line: "We could also say something [to Gellman] along these lines." Agency staff were presumably discussing how to communicate with the press, thus the redactions were both predecisional and deliberative. Accepting Gellman's argument would defeat the purpose of the privilege because it would reduce ability of government employees to be candid when deliberating how to respond to the press. See Am. Ctr. for Law & Justice, 325 F. Supp. 3d at 172 ("[I]f agency deliberations about public statements were FOIA-able, then agencies would be hamstrung in their dealings with the press, defeating the very transparency FOIA aims to foster.").

Internal emails seeking and expressing reactions to news articles *without* an articulated future decision, in contrast, are not properly withheld under the deliberative process privilege. That is because "Exemption 5 protection does not extend to documents that do not 'discuss the wisdom or merits of a particular agency policy, or recommend new agency policy.'" Leopold, 2020 WL 805380, at *4 (quoting Coastal States Gas Corp., 617 F.2d at 869). Mere internal reactions to the media do not relate to a particular decision by the agency. See Wolfe v. Dep't of Health & Human Servs., 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc) (instructing that Exemption 5 must be construed "as narrowly as consistent with efficient Government operation"). If a supervisor seeks reactions from her staff on a recent press report, it is equally likely in the Court's view that an agency employee could respond either by suggesting action (or nonaction) *or* by merely giving an opinion on the piece. The employee could react to an article with, "I think we should reach out to Gellman and tell him . . . ," or something like, "What a well-researched story! I wonder who his source is?" The former would be properly withheld under Exemption 5; the latter would not.

The problem here is that the Government has not given the Court enough information to conduct a *de novo* review of its withholdings. See, e.g., ODNI Doc. No. 74 (Interagency email chain *regarding* Plaintiff's news article concerning Yahoo and Google) (emphasis added); ODNI Doc. No. 83 (Interagency email chain *reacting* to *New York Times* news article concerning NSA collection) (emphasis added); OIP Doc. No. 0.7.19790.5154 (Singh Decl. Ex. C) (email chain from Henry Yearwood seeking "[a]ny reactions to all the interviews today?", with a redacted answer by Matthew Miller).[16] The Court will therefore deny summary judgment to both parties

---

[16] The Government justifies this withholding in particular by arguing that "such reactions *may have* included deliberations about further responses and/or statements." Defs.' Reply 19

and order the Government to (1) review all the documents withheld under Exemption 5 to ensure they are properly withheld consistent with this opinion,[17] and, should it maintain its withholdings, (2) renew its motion with supplemental declarations providing more detail about the deliberations it seeks to protect.[18]

### 2. Investigative Decisions

The FBI raises the deliberative process privilege to withhold OIP Document 0.7.19790.10989, which contains "information in an email between an FBI attorney, DOJ components and other FBI personnel discussing matters pertaining to the application of an investigative technique." Defs.' MSJ, Exh. B ("Hardy Decl.") ¶ 61. The Section Chief of the Record/Information Dissemination Section at the FBI explains that "the materials are predecisional in that they precede final investigative and/or prosecutive decisions, and

---

(emphasis added). But speculation in a brief is not enough. The Government has the burden to aver that the discussion was deliberative and identify the nature of the deliberations.

[17] The Court realizes that many of the records withheld under Exemption 5 are also withheld under Exemptions 1 and 3, such as where the reaction to a news article would expose whether the article did in fact reveal classified information. See supra Part III.B. To the extent a document or redaction is properly withheld under another exemption already upheld by the Court, the Government need not review that document for the application of the deliberative process privilege. The Government should note these overlapping documents in any supplemental declarations or Vaughn index.

[18] Gellman identifies two particular examples for which the Court struggles to see how Exemption 5 applies. First, the Government redacted a four-to-five letter word before Gellman's name in the subject line of an email. Pl.'s Reply 14–15 (flagging NSD Docs. 000034–000035). The Court finds it unlikely that such a redaction is properly withheld under the deliberative process privilege, even if portions of the email body would be. Second, ODNI Document 73 is an email chain among agency staff responding to a request by NSA Inspector General George Ellard to answer two questions related to Gellman's then three-year-old book about Vice President Cheney. There is no indication in the redacted email of any agency decision to which the discussion relates. Without a better understanding of the decision at issue, the Court cannot conclude that the discussion "makes recommendations or expresses opinions on legal or policy matters." Vaughn, 523 F.2d at 1144.

deliberative in that they played a part in the process by which specific decisions were made about the scope and focus of an investigation." Id. The agency has thus identified decisions to which the email pertained and averred that it was a part of specific decisions related to the investigation. Applying the presumption of good faith afforded to the FBI's declaration, the Court finds that this withholding was proper under Exemption 5.

E. Exemption 7

FOIA Exemption 7 permits an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production" of those records would result in one of eight enumerated consequences. 5 U.S.C. § 552(b)(7). Any invocation of Exemption 7 requires the agency, "as a preliminary matter, [to] make a threshold showing that the records were compiled for a law enforcement purpose." Pinson v. Dep't of Justice, 313 F. Supp. 3d 88, 113 (D.D.C. 2018) (internal quotation omitted). "Agencies classified as law enforcement agencies"—like the FBI—"receive a special deference in their claims of law enforcement purpose." Id. (citing Pratt v. Webster, 673 F.2d 408, 418 (D.C. Cir. 1982). The Government has met its burden to show that all the records withheld under Exemption 7 were compiled for law enforcement purposes. See Hardy Decl. ¶ 67 (explaining that the records were "compiled and/or created during the FBI's criminal and/or national security investigation of third-party subject(s) or in furtherance of the FBI's law enforcement, national security and intelligence missions"). The Court will therefore move on to consider whether the Government has established that disclosure results in any of the consequences listed in the statute.

1. Exemption 7(A)

Exemption 7(A) allows law enforcement agencies to withhold documents that "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). "The agency must show that the release of the records reasonably could be expected to cause

some distinct harm to pending or imminent enforcement proceeding or investigation." Shapiro v. Dep't of Justice, 78 F. Supp. 3d 508, 517 (D.D.C. 2015). The FBI has substantiated its withholdings under Exemption 7(A) with an *ex parte* declaration that the Court has viewed *in camera*. Gellman contends that he lacks sufficient information to challenge the FBI's justifications without access to the substantive portions of the declaration and requests that the Court review the documents themselves *in camera* to confirm that the FBI properly withheld them. The Court has carefully reviewed the *ex parte* declaration and finds that "viewed in light of the appropriate deference to the executive on issues of national security," Ctr. for Nat'l Sec. Studies v. Dep't of Justice, 331 F.3d 918, 926–27 (D.C. Cir. 2003), it sufficiently supports the application of Exemption 7(A) over these records. Therefore, the Court will deny Gellman's motion for *in camera* review of the documents and will enter summary judgment for the Government on this issue.[19]

### 2. Exemption 7(E)

Exemption 7(E) allows law enforcement agencies to withhold documents that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The Government has a "relatively low bar . . . to justify withholding" under Exemption 7(E). Blackwell v. FBI, 646 F.3d 37, 42 (D.D. Cir. 2011). It need only "demonstrate logically how the release of the requested information [may] create" a risk of circumvention. Id.

---

[19] Gellman also attacks the FBI's vague assertions of "certain other underlying exemptions," see Defs.' Reply, Ex. 2 ("Fourth Hardy Decl.") ¶ 4, but the Court need not reach those exemptions because all the withholdings were appropriately justified by the *ex parte* declaration.

Gellman does not challenge every withholding the Government justified under Exemption 7(E); he does not contest its use to withhold specific file numbers and names, or documents located within a secure FBI email system. He does, however, challenge its use to conceal techniques that the FBI declared were "generally known." See Hardy Decl. ¶ 83. He maintains that documents that discuss techniques that are known to the public—even in a "single publicly acknowledged instance"—must be disclosed. Pl.'s Cross-MSJ 40 (quoting Reporters Comm. for Freedom of the Press v. FBI, 369 F. Supp. 3d 212, 214 (D.D.C. 2019)). Gellman extrapolates from Reporters Committee that all records referencing a law enforcement technique must be disclosed under FOIA once it is acknowledged in a single instance. Public acknowledgment is only the beginning of the story, however. In Reporters Committee, the FBI responded to a FOIA request with a *Glomar* response—that is, it would neither confirm nor deny whether any responsive records existed—and the court held that the mere existence of records discussing a law enforcement technique could not be withheld under Exemption 7(E) when the technique is generally known. 369 F. Supp. 3d at 224. But, the court cited in a footnote the line of cases—not yet applicable because of the FBI's *Glomar* response—approving the withholding of records "where a technique or procedure was generally known, but where details of the technique or procedure's application were still secret." Id. at 223 n.8 (collecting cases). This case presents the latter circumstance, not the former. Accordingly, the Government may rely on Exemption 7(E) to withhold documents related to a generally known technique when the specifics of how and when it is employed are not known. See Shapiro, 78 F. Supp. 3d at 520.

Here, the Government has declared that while "the techniques may be known by the public in a general sense," "the technical analysis of the[] sensitive law enforcement techniques" is not. Hardy Decl. ¶ 83. The Government explains further that it is "the specifics of how and in

what setting [the techniques] are employed [that] is not generally known to the public." Id. ¶ 83; see also Fourth Hardy Decl. ¶ 10 ("It is publically known that the FBI collects and analyzes information as part of its investigatory functions. However, the type of information collected and its analysis varies from one investigation to another and depends on the specific facts of each investigation. This analysis is often documented in detail in the investigative file."). Similar explanations for withholdings were upheld by this Court in Davis v. FBI. See 18-cv-86, 2019 WL 2870729, at *10 (D.D.C. July 3, 2019) (upholding the FBI's withholding of "non-public details about techniques and procedures that are otherwise known to the public"); see also Shapiro, 78 F. Supp. 3d at 520 (approving the withholding of material that would "reveal specifics of how, and in what settings the techniques are employed"). The Court finds the Government has adequately justified the assertion of Exemption 7(E) over those documents and, accordingly, will enter summary judgment in its favor.[20]

**IV. Conclusion**

For the foregoing reasons, the Court will deny Plaintiff's Motion for *In Camera* Review, grant Defendants' Motion for Summary Judgment in part and deny it in part, and grant Plaintiff's Motion for Summary Judgment in part and deny it in part. A separate Order shall accompany this memorandum opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: March 20, 2020

---

[20] The FBI also claims exemption 7(E) to justify withholding OIP Document 0.7.19790.10989, which involves different issues than those addressed above. But the Court need not decide whether Exemption 7(E) properly applies to this record because the entire record is exempt pursuant to the deliberative process privilege. See supra Part III.D.2.